Tarpley v. City Colleges of Chicago Good morning, Your Honor. Mr. Tarose, we can lower the... Judge, if you don't mind, you won't have to do that. Okay. Because I'm far enough back here. I apologize. Of all days, my wife didn't charge my machine, and its battery is very low. Good morning, Your Honors. Good morning. Good morning, Judge Rogler. Judges, what I'm trying to ask the Court to consider is based on the new, I guess, the electronics we have in our world today, where we know so much more about what people are thinking and saying. This case screams at us. This case is a case of e-mail communications among hierarchies telling their actual feelings about the animus towards my client, who was a wonderful educator, who everyone at Kennedy King College in Chicago thought was better than sliced bread. We had e-mails where the administrative assistant to the president, President Esther, says, You are exceptional. Your team takes care of our every whim, and it's a great credit to you. We have the student body trying to give her an award, which is stopped by Shell Stephens, who is really the person that I guess is a plaintiff, I would say is where is a black cat in this case. As you probably have gleaned, my client has a very unique physical malady. They call it endometriosis. As a result of that, she went through five miscarriages. She has been trying, at the time of this lawsuit, one last time to get pregnant. Because her doctor said she has to take off two days a month, she was getting glowing recommendations from everybody, and she would write to her administrator and say, I went to all the campuses, the satellite campuses, the Kennedy King also, and I have everything lined up, and she would tell them in e-mails what she had done. Everything seemed to be wonderful. She said, if anyone needs me, I've given my cell phone, telephone number to all administrators. I've given students ways they can reach me, so if they have problems with informational technology on campus, I will make sure it's attended to. Mr. Jerome, in terms of her FMLA leave, tell me if I'm wrong, but as far as I can tell, she was never denied any leave time, and, in fact, took all of the time available to her. So what I'm wondering is, in what concrete sense did the college interfere with her FMLA rights? Changing the timing of leave calculation or asking for her attendance records for purposes of calculating her available leave time are normally viewed as routine matters? Your Honor, that's all correct, but our problem is this is a retaliation case. What we have all of a sudden, on April 25, 2013, her boss says to the brand new administrator, you've got to help me. We find out two weeks later, they start changing all of the requirements for my client, which she could have lived with, Your Honor. She could have handled all of those additional requirements, and her doctors would have honored them, although the doctor said they're really getting to be paid for the next. But the biggest thing is, what are they saying in their emails? Not only do you got to help me, we've got her replacement. Now we want to promote her staff person and make him have her position. She is communicating and telling her people, I want to know what you're doing on campus. She gets a direction from her supervisor, you are not to communicate with your staff. You have nothing to do with them while you are on leave. I asked the chief of staff, do you have any policy that says someone on intermittent medical leave cannot communicate? No, we don't have any. Do you have any written policy that there's no work from home? No, we have no such policy. But her boss calls her and says,  But the even larger point of my case, Your Honor, and why I think a jury should have the right to hear this, is the statement, finally, I want to, we really want to replace her with Benjamin Kent. And what we find out, I asked her, what was Benjamin? He was a typical employee. It's just they want her out. Now here's the lady, and it's because she is so popular on campus, and they don't have control over her. It's a human interest kind of case. And I really believe that this is not something, when we're talking about animus, this is not the kind of thing we decide on summary judgment. This is something, if a jury were to hear this, I really believe they will be very insulted by what has occurred. Now, what is your best case for the notion that Ms. Tarpley was constructively discharged? She was never denied leave time. She was never denied an accommodation. She was assured she was not being fired when her job was posted. And although our troubling, they are troubling, she was not aware of them at the time. So in what sense had the workplace become unbearable for her? Because, you know, that's our test. Judge, the workplace itself was not unbearable. It was the treatment she was receiving. And I do agree with you, she didn't know about those emails. Had she known about everything we've uncovered and discovered, she would know why she was feeling so anxious. She writes them, my job is being posted. I have been terminated. I am suffering from anxiety and depression. I have psychiatric help. I've been working very hard. I know that you don't like it when I'm not there. But hell or high water, the job gets done. And you folks are just not honoring the fact that I need this medical leave, which I am entitled to and which my doctors have said I've got to have. The doctors finally say you've got to quit or you're going to have another miscarriage. This was unrequired change of guard. She sees her job posted on the Internet. Well, they were posting that in order to have a backup in case she didn't come back. Isn't that what that was to do? And you also keep talking about these emails. I assume those were sort of personal people talking back and forth to each other. Maybe they were not saying nice things, but this is not something that she was even aware of until later on. And the same thing with the FMLA. She got all that she asked for. Yeah, but they say that she's not to communicate or do some other things while she's on leave. And I'm not sure what their policy was on that. But nevertheless, it may have been that they didn't want her trying to run the show when she's not there. Your Honor, she was always frank with them. Her email says, and she doesn't know about what they're doing, that they've actually really offered the job to this fellow, Benjamin Kent. They say in their emails, we really, really want Benjamin Kent. Could they have both of them at one time? Could they? They could have had three or four or five. But, Judge, they didn't need that. And the truth of the matter is they lost control over her because she wasn't at their worksite and she wasn't needed at the worksite. And for the two days, that was a minor accommodation. And once she changes and says, I asked for an accommodation under the ADA, as the Labor Department suggests she did, they say, oh, we've got to take the promotion of Benjamin Kent off the books. Don't put it before the Board of Trustees. The record is just screaming at us that this is all very possible time. Clients, they are trying to replace her job while she is taking FMLA and performing her job admirably. Not just while on leave, you're saying. She was doing her job admirably while she's on FMLA leave. Yes, Judge. It would only be two days a month that she had to take off. She's there every other day? Every other day of work. And, Your Honor, when she's working, she is very successful. Now she had to have a couple of operations after these miscarriages. And when she'd be off, I think the longest she was off was a one-month period. The job was running fine. And she would make sure that everybody knew what to do. And when she would give a complaint, she would address it with her staff. Why are you not taking care of this? Until finally her boss says, you are not to communicate with your staff while you're on FMLA. It's all because they are trying to put roadblocks in a lady who says, I love my job. I'm good at my job. And I love this campus. I am dedicated to this. This is just what FMLA intermittent leave is all about. Find a way to get it done if possible. Don't take her job. And she says, she writes that you're making it so rough on me. I feel I have no job. I'm becoming very emotionally distraught. I admit, I'm confused. You say that she's only gone two days a month. Otherwise, she's there. On intermittent leave, yes. But, Judge, when she had to have the surgeries, the one I speak to right now was January 2012. She had a miscarriage. She was off an entire month. The campus ran perfectly that month. When she came back, they said, you can have two days a month off for the next year and a half. Well, in April, when her boss says you've got to help me, she gets a brand new HR representative who admits in her deposition, I don't know how it works, but they work together and they're laughing at my client. Every time she says, I need to, and they say, well, we can't satisfy her. She wants to do her job. There is nowhere anywhere in your world, my client, and she tells them I'm dedicated to working with you, Ms. Stevens. I'm so proud that now you have become a president. And now that you have, we are going to be a wonderful team, and I know we'll get a good job. Well, while she's writing all of these glowing things and promises of help to the president, what is the president writing in the background? All right, let's get rid of her. I want to give the job to Mr. Kent. Mr. Benjamin Kent had been interviewed. He didn't go through the regular interview process. They broke all the rules. They even said, well, you can't interview me either for the other campuses, but I want Benjamin Kent there. And when she gets it right, he's just another employee. He has good things and bad things, just like everyone else. There was no pleasing Ms. Stevens. You might want to save some time for your rebuttal. I do, Your Honor. All right, thank you, Mr. Lemos. Mr. Bill Cardney? Matt? Matt? What's this that fell down? Good morning. May it please the Court, my name is William McCorney. I represent the Board of Trustees of Community College District No. 508, City Colleges of Chicago. This case is really one that revolves around the question of whether the plaintiff, Elizabeth Tarpley, was subjected to any adverse employment action whatsoever prior to her resignation from City Colleges of Chicago. Well, the internal e-mails and the fact that Mr. Stevens was entertaining a replacement for her do seem to permit an inference that the college was looking negatively upon Ms. Tarpley's use of leave time and her medical condition, don't they? So there's a few responses to that, Your Honor. First of all, in this case, Judge Ellis' procedures involved the creation of a joint statement of undisputed facts. Among the facts included in that joint statement of undisputed facts were an explanation of the reasoning for posting the IT director position at Kennedy King College during the summer of 2013. And the reasoning was, first of all, that the plaintiff, Ms. Tarpley, had initially given notice that her leave would be for at least the first week of June and possibly up to three months thereafter. And there was some concern on the part of the leadership at City Colleges that it was possible she may not return at all. So there was both a need for a contingency plan in the event that she didn't return and possibly an interim appointment during the period that she might be on extended leave. But it is stated in the statement of undisputed facts that the parties prepared and that Judge Ellis reviewed and found to be undisputed that the intention was never to terminate Ms. Tarpley's employment. Had Mr. Kent been hired and had Ms. Tarpley returned from leave after his hire, there would have been some decision as to whether do we need to have two IT directors at this college that admittedly serves thousands of individual users? Would we put Mr. Kent at another location? Would we find an equivalent position for Ms. Tarpley? But as it happens, that decision never had to be made because Ms. Tarpley gave notice that she intended to return to work on July 15th of 2013. How long was she absent? I'm confused on this. Is that this two-day-a-month thing? So there are a few different periods of FMLA leave, and these are all laid out in the joint statement of facts. Initially, she was on leave during the summer of 2012 for a period of time. And then between the summer of 2012 and the summer of 2013, she took leave on an intermittent basis, and the dates are all laid out in the joint statement of facts. Then beginning in early June of 2013 through July 12th of 2013, she took the remainder of her 12 weeks of FMLA leave. So there is a 12-week structure of some kind. Yes. And she took that out at varying times. Correct. And, again, as laid out in the statement of facts, that structure did change. So initially there was a fixed 12-month period being used when she took her leave in 2012. There was a change that was done in accordance with the FMLA regulations so that it was by the time she took her leave in the summer of 2013, the leave was measured on a 12-month rolling basis. But she did receive her full 12 weeks of FMLA entitlement. And she was never, when she did request that she needed additional leave beyond July 12th, that request was considered. City colleges never had to grant that because she gave notice that she was coming back before that needed to be used. So it became moot at that point. Your Honor, the main issue that I want to bring forward, though, is, you know, again, counsel has focused almost his entire argument on the question of city colleges' motives. And that is not the issue that was, not the primary issue that was presented to the district court for purposes of summary judgment. And it was certainly not the issue that we identified in our briefs before this court. The district court found that in responding to the motion for summary judgment, plaintiff waived the issue of whether she was subjected to an adverse employment action. That finding was expressly in Judge Ellis' decision. On appeal, counsel did not address that issue of waiver at all in the opening brief. And it was addressed only perfunctorily in the reply brief in support of the appeal. So our submission is before the court even needs to wade into the question on the merits, which we think is amply addressed by the statement of facts and was properly addressed by the district court, there's a question of waiver here. And the plaintiff has waived any argument on the issue of whether they were subject to an adverse action. I did also want to address the question that counsel raised about Ms. Tarpley being told that she was not allowed to communicate with her staff while she was on leave. Because I think my colleague, Mr. DeRose, misstated some of the facts relating to that. So in May of 2013, when Ms. Tarpley was using her intermittent FMLA at that time, there was some communication between her and Arshele Stephens, who was her immediate supervisor at the time. Is this who you referred to as the boss? The boss lady, yes. That's correct, Your Honor. The communication was to the effect that Ms. Tarpley had initially said she was going to take May 10th off as a sick FMLA day. And then she emailed Ms. Stephens to say that, oh, after all, I'm going to work from home on that day. This is the email that Ms. Stephens sent back and said there is no work from home policy. And that was an absolute true statement. There was no policy at city colleges that said she could work from home or she couldn't work from home. The policy set forth in the Joint Statement of Uncontested Facts was that you had to get approval from your individual supervisor. And Ms. Stephens at that point had had this occur on a number of occasions when Ms. Tarpley had said that she was going to work from home and said, no, I don't think that's appropriate. We're not going to allow that on this day. So that was addressed on that day. There was an exchange of email where Ms. Tarpley became testy. But in that email exchange, one of the points that Ms. Tarpley raised was she was often asked to perform work tasks while she was supposed to be out sick and on leave. And that concerned Ms. Stephens. And one of Ms. Stephens' responses was to go to the Human Resources Department and to make clear that when somebody is on leave, they should not be asked to perform work tasks. And she understood, in fact, that Ms. Tarpley was complaining about the fact that she was being asked to perform work while out on leave. So in July, or I'm sorry, in June of 2013, when this issue came up again and Ms. Stephens learned that Ms. Tarpley was having work communications with some of her staff while she was supposed to be out on FMLA leave and her doctor had certified that she can't have any stressful environment, Ms. Stephens stepped in and reminded her that, look, you're on leave, you're not supposed to be working, your staff is being adequately supported, and we will catch up with you and make sure you have the information you need when you get back. And that's exactly what happened. Ms. Tarpley came back, she received a briefing, and she was brought back up to speed. So there was no nefarious intent, and Ms. Tarpley was certainly not directed that she was not allowed to speak with her staff. What she was told is you're not allowed to communicate with them on work issues. We can catch you up on that when you get back to work. So again... Can't you see an inference that, you know, her return date is approaching. She's learned her co-workers have been told not to discuss work matters with her. She sees that her position has been posted. I mean, isn't there another way to look at all this? That someone might have the feeling that she was being forced out of her position, rather than, you know, all this kindness that you maintain is happening? Well, so one might infer if the only facts in the record were those facts, Your Honor. But the fact is that when Ms. Tarpley expressed, when she was coming back to work on July 15th and wrote that she was worried because she saw that the job was still posted, that she had been fired, the response from City Colleges was to have the head HR official, the Vice Chancellor of Human Resources, Stephanie Tomino, call Ms. Tarpley and personally reassure her that she was not being fired and explain the purpose of the job posting, that it was a contingency plan, that her job was still there. And Ms. Tarpley disputedly thanked her for the explanation, said that she understood, even called back and left a voice message, again, thanking her for the explanation, and she returned to work the next day. So even if there could be some inference that, you know, perhaps at one point, City Colleges might have contemplated replacing her, again, that's contrary to the joint statement of facts that the court has deemed admitted, and properly so based on the record. But even if a jury couldn't make that inference that there was some adverse motive on City Colleges' part, the fact is it never came to fruition. She was reinstated immediately when her doctor cleared her to return. The only change in the terms and conditions of her employment at that point was that she got a raise. So there's no way that a jury could infer from that set of facts that plaintiff was subject to an adverse employment action as opposed to perhaps some frustrations or negative feelings on the part of the leadership that were undisputedly never expressed to the plaintiff. And again, relating to the issue of the constructive discharge, counsel refers to the treatment that Ms. Harpley received. Well, again, the treatment that Ms. Harpley received at the point of her resignation on August 5th of 2013 was she had at that point, just a couple weeks earlier, been personally reassured by the Vice Chancellor of Human Resources that she had a job, nobody was trying to get rid of her. She returned to work, she exchanged glowing emails with President Stevens, who at that time had transitioned to the president of Kennedy King College, and expressing how much she loved her job. She made additional requests for FMLA leave, the one request was granted, the other request was in process, and then she submitted her resignation. There's nothing that occurred during that period of time that any reasonable jury could look at and conclude that the plaintiff was forced to resign. There's some question about the constructive discharge being waived. What's the position on that? Again, we believe the constructive discharge, along with all the arguments as to adverse employment action, was waived by counsel both below and then again on appeal, and that counsel also waived the issue of waiver in there. Does a lot of this come about because of this joint statement of facts, where she didn't raise all this? I'm just sort of confused about Mr. Rose's argument, and then what exactly she was doing and not doing. It sounds like, at least from your standpoint, she was being accommodated, and this not got to the point where there was actually some issue about being discharged. You know, just because there was a, what do you call it? When you put a notice, there's, what do you call it? A job posting. Pardon me? A job posting? Yeah, a listing. Yes, a listing. There's a listing that implies that she's going to be replaced or at least someone else is going to be brought in to supplement whatever. You're talking about some possibility of doing the same job or different parts of that job or something with both of them there. I'm sorry, I'm not sure. Both of them being there. It could have been someone brought in at the same time that she would be coming back to work. There was consideration given to that, but, again, regardless, it's undisputed that any consideration of that was dropped and that Mr. Kent was not hired while Ms. Tarpley was still with City Colleges. So whatever the intentions were, you can't base a lawsuit on bad intentions. There has to be some actual adverse action. So, again, unless the court has any further questions, we ask the court to affirm the judgment. All right. Thank you, Mr. McCarty. Your Honors, this is a jury question. This is more of all over this case. We waived nothing. We always told the court that we thought she was being set up to be terminated. The emails scream at us. We found all this in discovery just as my client had suspected. She tells them in emails, I fear for my job and I have protection under FMLA. What really is going on here? And the last statement that Ms. Tomasino writes, Elizabeth wants to stay. Start reading with the original message and hope you both are having fun. I did not want to withhold this entertaining turn of events. They're mocking her because she tells the boss, she tells Mr. Lynch, who is the chief of staff, I love my job. I'm good at this job. I want to care for this campus. I believe in the Kennedy King College. What is going on with me? All she's doing is exercising a right that she has protection for. All I ask is give us the chance to present all those emails to a jury and question these people as I did in their depositions. They have no answers for this. They're laughing. Steven says, well, Tomino just has a big mouth or she says too much. It's not that simple. My client is getting emotionally traumatized by all that they're doing to her while she's exercising a right to which she is entitled. Thank you, Your Honor. I see my red light. And thank you very much. Thank you, Mr. Holmes. Thank you, Mr. McCartney. The case is taken under advisement, and the court will take a ten-minute recess.